```
            IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF TEXAS
                    DALLAS DIVISION

NORA VARGAS, on behalf of herself and
others similarly situated,

        Plaintiff,

vs.                              3:23-CV-02689-B

PANINI AMERICA, INC.,

        Defendant.

                  SHOW CAUSE HEARING
         BEFORE THE HONORABLE JANE J. BOYLE
            UNITED STATES DISTRICT JUDGE
                  AUGUST 28, 2024

            A P P E A R A N C E S

For the Plaintiff:

     ROGGE DUNN GROUP, LP
     500 N Akard - Suite 1900
     Dallas, TX  75201
     214/747-1304
     nesbitt@roggedunngroup.com
     webster@roggedunngroup.com
     BY:  EARL STROUD NESBITT
          LANE M. WEBSTER
and
     WEINBERG ZAREH MALKIN PRICE, LLP
     Litigation
     45 Rockefeller Plaza, 20th Floor
     New York, NY  10111
     347/836-9721
     omid@wzmplaw.com
     jfant@wzmplaw.com
     BY:  OMID ZAREH
          JOHN FANT
          WILLIAM PHAM
and
```

```
APPEARANCES CONTINUED:

     THOMPSON COBURN, LLP
     2100 Ross Ave - Suite 3200
     Dallas, TX 75201
     972/629-7168
     Email: apennetti@thompsoncoburn.com
     BY:  ALEXANDER J. PENNETTI

For the Defendant:

     GORDON & REES SCULLY MANSUKHANI, LLP
     1900 W Loop South - Suite 1000
     Houston, TX  77027
     713/490-4821
     ldesantos@grsm.com
     mmmitchell@grsm.com
     BY:  LAURA E. De SANTOS
          MEGAN MCGREGER MITCHELL
and
     LOCKE LORD, LLP
     600 Travis Street - Suite 2800
     Houston, TX  77002-2914
     713/226-1344
     dgregory@lockelord.com
     BY:  DAVID MITCHELL GREGORY

     LOCKE LORD
     2200 Ross Avenue - Suite 2200
     Dallas, TX  75204
     214/740-8453
     sroberts@lockelord.com
     BY:  SETH MICHAEL ROBERTS

COURT REPORTER:  SHAWNIE ARCHULETA, TX CCR No. 7533
                 1100 Commerce Street
                 Dallas, Texas 75242


proceedings reported by mechanical stenography,
transcript produced by computer.
```

```
 1                (In open court at 10:28 a.m.)
 2                THE COURT:  This is Case Number
 3     3:23-CV-2689-B, Nora Vargas versus Panini America,
 4     Inc.
 5                We are here this morning for an unusual
 6     hearing, because of the allegations of the AI brief.
 7     We'll get into that in a minute.  But I would like
 8     to have each side introduce themselves, state who
 9     they are and who they represent, and I will start
10     with counsel for the Plaintiff.
11                MR. NESBITT:  Earl Nesbitt with Rogge Dunn
12     Group representing the plaintiff.
13                THE COURT:  Okay.
14                MR. ZAREH:  Good morning, Your Honor.
15     Omid Zareh with Weinberg, Zareh, Malkin, Price, also
16     for the plaintiff.
17                MR. WEBSTER:  Lane Webster with the Rogge
18     Dunn Group, as well on behalf of the plaintiff.
19                THE COURT:  Okay.  Anybody else?
20                MR. FANT:  John Fant with Weinberg, Zareh,
21     Malkin, Price --
22                THE COURT:  I'm sorry, I can't hear you.
23                MR. FANT:  John Fant with Weinberg, Zareh,
24     Malkin, Price.
25                THE COURT:  All right.  Is everybody here
```

```
 1   with Rogge Dunn?
 2           MR. PENNETTI:  Alex Pennetti.
 3           THE COURT:  Okay.  Tell me who you're
 4   with.
 5           MR. PENNETTI:  I'm with Thompson Coburn.
 6           THE COURT:  Wait, no.  You right here.
 7           MR. PHAM:  William Pham.
 8           THE COURT:  Mr. Nesbitt.
 9           MR. NESBITT:  Yeah, I'm sorry, Rogge Dunn
10   Group.
11           THE COURT:  Okay.  And you are Mr. Zareh.
12           And you are with?
13           MR. ZAREH:  Weinberg Zareh.
14           THE COURT:  And I know you are with Rogge
15   Dunn and -- go ahead.
16           MR. PHAM:  William Pham, Weinberg Zareh --
17           THE COURT:  Okay.
18           MR. PHAM:  -- for the plaintiff.
19           MR. PENNETTI:  Alex Pennetti, Your Honor.
20   I was formerly with Rogge Dunn Group.
21           THE COURT:  Yes.  Thank you.
22           MR. FANT:  John Fant, Weinberg Zareh.
23           THE COURT:  Thank you very much.
24           And for the defense?
25           MS. DE SANTOS:  Good morning, Your Honor,
```

```
 1    Laura De Santos on before of Panini America.  I'm
 2    with Gordon & Rees, Scully, Mansukhani.
 3              THE COURT:  Okay.  You're with Gordon &
 4    Rees?
 5              MS. DE SANTOS:  Scully Mansukhani.
 6              MS. MITCHELL:  Good morning, Your Honor.
 7    Megan Mitchell, also with Gordon & Rees Scully
 8    Mansukhani.
 9              THE COURT:  Okay.
10              MR. ROBERTS:  Good morning, Your Honor.
11    Seth Roberts with Locke Lord here in Dallas
12    representing Panini America.
13              THE COURT:  Okay.  And the other firm is
14    out of town?  The firm -- they're not from Dallas,
15    they are from out of town?
16              MS. DE SANTOS:  Correct, well, Houston and
17    Dallas.
18              THE COURT:  Okay.  Thank you.
19              Go ahead.
20              MR. GREGORY:  David Gregory with
21    Locke Lord, from the Houston office of Locke Lord.
22              THE COURT:  Okay.  Thank you-all very
23    much.
24              Okay.  This is a defense motion.  And I
25    have read all through the motion a couple of times
```

```
 1   and read all the cases and read the cases that were
 2   cited by the plaintiffs.
 3            So let's begin by having the defense come
 4   up here and give me their best case.  Come on up.
 5            Who is going to speak for the defense?
 6            MS. DE SANTOS:  I'm happy to, Your Honor.
 7            THE COURT:  Come on up here.
 8            MS. DE SANTOS:  And by "here," I hope you
 9   mean here.
10            THE COURT:  Right there, yes.
11            MS. DE SANTOS:  I really will actually
12   just keep my comments brief, Your Honor.  Because I
13   think the Court has identified in its show cause
14   order and in Document Number 36 that was issued just
15   last week, the -- has put its finger on the issues
16   that have caused a bit of confusion, certainly on
17   the defense side and for the Court.
18            The plaintiff's response to the motion to
19   dismiss contained, as the Court is well aware, a
20   number of cases that were represented to address and
21   rebut specific legal arguments that were made with
22   regards to the individual claims that Ms. Vargas
23   brings and the class representative claims that she
24   brings.
25            Often those claims or the representations
```

```
 1   that were made and the cases that were cited --

 2            THE COURT:  Slow down.  Slow down.  The

 3   cases that were cited.

 4            MS. DE SANTOS:  The cases that were cited

 5   does not stand for the proposition, in fact, that

 6   they were representative.

 7            THE COURT:  Go ahead.

 8            MS. DE SANTOS:  In addition, there were

 9   cases cited that were, in fact, legitimate cases

10   containing, perhaps, citation errors, but legitimate

11   cases that did not hold for the proposition for

12   which they were represented.

13            As a result, the defendants filed a reply

14   brief identifying each of these issues.  There

15   was -- and in our reply brief, of course, we contend

16   and surmise that the briefing appears to have --

17            THE COURT:  AI.

18            MS. DE SANTOS:  -- AI, yeah.  I'm

19   struggling with another explanation for it.

20            To suggest that two law firms with

21   competent lawyers worked together to file this brief

22   did not make it better but, in fact, made it worse.

23            THE COURT:  How do you mean made it worse?

24   How did they make it worse?

25            MS. DE SANTOS:  My understanding from the
```

```
1   plaintiff's response is that the errors that are
2   identified were a result of merging work product.
3           THE COURT:  Yeah, and then -- I was
4   thinking you were saying when they filed the
5   response to the show cause order.
6           MS. DE SANTOS:  All right.  So I was
7   addressing the initial response, Your Honor.
8           Nonetheless, I think the show cause order
9   requested very specific information, most notably --
10  or at least what I picked up on, Your Honor -- is
11  the Court's request for information as to how -- how
12  those cases got into the brief to begin with.
13          I don't believe that has been fully
14  explained.  We have identified in both our reply
15  brief and in our response -- or response to the
16  plaintiff's response to the show cause order that
17  there are still issues that haven't been fully
18  addressed.
19          For example, how did the Bradshaw, the
20  Mims, the Dobbins, the Johnson v. Pride case, how
21  did those cases get into the brief?  And how did the
22  representation come to be that they held for a
23  specific proposition that conveniently rebutted a
24  specific legal issue that we raised with regards to
25  our opening motion to dismiss?
```

1          THE COURT:  But they didn't.

2          MS. DE SANTOS:  They didn't.  And although

3    there has been an abundance of *mea culpa* associated

4    with the briefing, there hasn't been the underlying

5    explanation as to how that happened.

6          I believe that's really, I think, one of

7    the central issues of why we are here and why we

8    believe the show cause issue has not been fully

9    addressed for the Court and for the parties in the

10   case.

11         THE COURT:  Okay.

12         MS. DE SANTOS:  We are not seeking -- and

13   in case there is any specific doubt, we are not

14   seeking any attorney's fees.  We are not seeking any

15   sanctions in the form of attorney's fees to the

16   defendants.  We will leave it to the Court to make

17   whatever remedial action it feels is appropriate

18   under the circumstances.  We are not seeking that

19   here.

20         I think -- I got up here and said I was

21   going to be brief, and I'm not being brief.

22         THE COURT:  No, no, take your time.  I

23   want to hear all of this.

24         MS. DE SANTOS:  I think the Court has --

25   we have filed in our response to the plaintiff's

1   filing, Document Number 43.

2              THE COURT:  Yeah, I've got it.

3              MS. DE SANTOS:  I think I've addressed the

4   fact that we're still struggling to understand how

5   those got into the brief.  It doesn't make sense

6   that the merging of work product from two different

7   firms resulted in a misrepresentation of what those

8   cases held.

9              I certainly, I'm sure, in -- in editing

10  briefs, have made typos, meant to cite F.Supp. and

11  accidentally cited F.2d.  Certainly that's a very

12  common error.  And I'm certainly not going to

13  suggest that this is just a typo.  These are more

14  than just typos.  These are more than, We just cited

15  the wrong volume or page number or had poor Blue

16  Book citation.

17             These are fundamental representations to

18  the Court rebutting specific legal arguments that

19  are, in fact, either untrue or misstated, grossly

20  misstated in some instances, and just plain false.

21  And it's hard for us to see how those don't arise

22  outside of the AI context.

23             I think I have also addressed the fact

24  that the Court's show cause order specifically

25  requested that explanation.  That has not been

1    provided.

2            The third issue I want to raise is that

3    the plaintiffs, in their response to the Court's

4    request on the show cause order, almost doubles down

5    on the response to the motion to dismiss and

6    continues to take the position that their legal

7    positions are warranted, when a review of their

8    briefing suggests that that's, I think, a further

9    representation that I think lacks good faith in

10   suggesting that their response to the motion to

11   dismiss ought to win them the day and that the

12   motion to dismiss ought to be denied.

13           In fact, a careful look at those, the

14   deficiencies and those cases that do not, in fact,

15   hold what they represent, leaves them without

16   response at all to our motion to dismiss in a lot of

17   instances.

18           In fact, I would argue the class claims

19   can be dismissed because they have not presented any

20   real authority to rebut those allegations.  And the

21   individual claims for hostile work environment,

22   wrongful discharge and retaliation similarly lack,

23   frankly, any response that is legitimate.

24           And I think the plaintiff's arguments,

25   further, with regards to both *Allison* and the

1  *Deepwater Horizon* case, as represented, don't fully

2  address what the Court's holdings have been in that

3  case.  And because of that, just to circle back to

4  those class claims, those, too, should fail.

5          So my -- I think my final point here, Your

6  Honor, is, I don't think the plaintiffs have come

7  forward with sufficient information to rebut the

8  motion to dismiss.  The motion to dismiss should be

9  granted.

10          And in response to the Court's request

11  that they explain how those misrepresentations got

12  into the record, got into their brief, has not been

13  sufficient.  And for that reason, I think they have

14  failed to meet the Court's -- the Court's request to

15  show cause.

16          THE COURT:  Well, thank you very much,

17  Ms. De Santos.  Do you have anything else to say?

18          Okay.  Who is going to speak for the

19  defense?

20          MR. NESBITT:  Your Honor, I'm going to

21  start off, but also Mr. Zareh would like to address

22  the Court.

23          THE COURT:  Where is Mr. Dunn, Rogge Dunn?

24          MR. NESBITT:  He's out of the country,

25  Your Honor.

```
 1              THE COURT:  Okay.

 2              MR. NESBITT:  He did not work on the brief

 3    at all.

 4              THE COURT:  Okay.  Okay.  All right.

 5              Mr. Pham, then, go ahead, come on up.

 6              MR. NESBITT:  Mr. Nesbitt.

 7              THE COURT:  I'm sorry, Mr. Nesbitt.  Yes,

 8    yes.

 9              But let me say first, just be very careful

10    about what you say here.  Because, you know, to me

11    it's very clear this is an AI brief.  I will hear

12    from you, and maybe I will change my mind.  But I

13    just want to make sure that you don't get up there

14    and double down on something that is just not true.

15    Just fall on your sword, please tell me the truth.

16    But I'm going to have a hard time finding this is

17    not an AI brief.

18              Go ahead.

19              MR. NESBITT:  Understand, Your Honor.  I'm

20    going to go ahead and start off and say that -- and

21    I think Mr. Zareh will address it from the

22    standpoint of what I am going to call our New York

23    co-counsel -- this was not an AI brief from Rogge

24    Dunn Group.  We've been assured by co-counsel it was

25    not an AI brief from them.
```

```
 1              THE COURT:  Well, you know, did you-all
 2    work on it?
 3              MR. NESBITT:  Did Rogge Dunn work on it?
 4              THE COURT:  No, did Rogge Dunn work on it?
 5              MR. NESBITT:  Rogge Dunn Group attorneys,
 6    myself and Mr. Webster, yes, we worked on it.
 7              THE COURT:  Are you the main ones that
 8    worked on it?
 9              MR. NESBITT:  I would not say we were the
10    main ones.  The original product came from our
11    co-counsel in New York.  And then we worked to
12    revise it and --
13              THE COURT:  Okay.  Well --
14              MR. NESBITT:  But what I can say
15    unequivocally is that -- and I think Mr. Webster
16    will -- if he needs to, will address the Court, is I
17    wouldn't know how to use AI in a brief, to be
18    honest, and I did not use AI on this brief.
19              THE COURT:  Well, somebody did, because
20    it -- it just -- it would be too hard to make these
21    mistakes so consistently through the brief that --
22    on your own just make those stupid mistakes, because
23    it's not even lawyering.  It's just bad, bad
24    briefing.
25              And so I say that because I think one or
```

```
 1   two mistakes like that would be fine, but all the
 2   way through, and it's just consistent.  And I think
 3   it would be so much harder to make a brief like that
 4   rather than a good brief to get that right.  I mean,
 5   all those wrong cites to put that down in writing
 6   and make that your presentation.
 7             MR. NESBITT:  I can agree with the Court
 8   on a couple of things.  Number one is that it's a
 9   bad brief.  And number two, it has wrong case
10   citations.
11             I can also agree that it was -- it would
12   be -- it would seem to be and appear to be a lot
13   more difficult to prepare this bad brief rather than
14   a good brief.  I agree with you.
15             THE COURT:  Yes, exactly.
16             MR. NESBITT:  But I can assure you that
17   that was not the intention.  And I can only speak
18   for myself and the people that worked on it at our
19   firm, and I believe Mr. Zareh will address it from
20   his.
21             THE COURT:  Did Mr. Webster primarily work
22   on it or who?
23             MR. NESBITT:  I would say it was me and
24   Mr. Webster together.
25             THE COURT:  Okay.
```

```
 1              MR. NESBITT:  And neither one of us used

 2      AI.  And he can certainly address that with the

 3      Court.

 4              With respect to the miscites and

 5      procedurally -- and I think I need to address

 6      that -- is the Court indicated that we were here on

 7      defendant's motion.  And as counsel has suggested,

 8      they don't have a motion.

 9              THE COURT:  I know.

10              MR. NESBITT:  We are here to address the

11      order to show cause, and we felt like we addressed

12      the order to show cause in the reply brief.

13              THE COURT:  But you didn't, because even

14      when you did, you cited to a case that didn't stand

15      for that proposition.  I'm trying to find it, where

16      I found it, but -- just a minute.

17              MR. NESBITT:  Sure.

18              THE COURT:  I can't find it right now --

19      oh, yeah, yeah, response to the OSC contained -- I

20      don't have it right here.  Yeah.

21              MR. NESBITT:  Well, I can --

22              THE COURT:  Anyway, there's a miscited

23      case in the response to the OSC.

24              MR. NESBITT:  I -- I've looked at all of

25      those cases before and last night, and from our
```

```
 1   perspective, the response that they filed was --
 2   falls into -- with respect to their criticism of the
 3   case --
 4               THE COURT:  Their response or your
 5   response?
 6               MR. NESBITT:  Sorry.  Their response to
 7   our response.  And that was a little confusing,
 8   because we were responding to the order to show
 9   cause.  I'm not sure what they were responding to.
10               THE COURT:  Well, they were putting their
11   two cents in, which they are entitled to.
12               MR. NESBITT:  Exactly.
13               Their criticism of our response to the
14   order to show cause relative to the specific cases
15   falls into two categories.  And one was that we
16   didn't go far enough in explaining it.  And for
17   instance, in the *Allison* case, they -- we did cite
18   it for the proposition that the 5th Circuit had
19   recognized that individual monetary relief can be --
20               THE COURT:  Slow down.  Slow down.  Go
21   ahead.
22               MR. NESBITT:  Sorry.
23               THE COURT:  Go ahead.
24               MR. NESBITT:  Sorry -- recognized that
25   individual monetary relief can be sought within the
```

1    framework of a class action provided it does not

2    predominate over the common issues of fact.  That is

3    in that case, and it says that exactly.

4           Their criticism was that we did not set

5    forth that in *Allison* the Court did not find that

6    the individuals predominated.

7           But, in fact, in our *mea culpa* letter, we

8    acknowledged that very fact.

9           THE COURT:  That's fine.  So you did that.

10   What about *Mims*?  What about these other cases,

11   where they had absolutely nothing to do with --

12   either the case cite was wrong or it cited a

13   proposition that didn't exist for that case?

14          MR. NESBITT:  That was the cases that we

15   addressed in the *mea culpa* letter.

16          THE COURT:  Go ahead and tell me about

17   them.

18          MR. NESBITT:  They were wrongly cited.

19   They do not stand for the proposition, and we fessed

20   up to that.

21          THE COURT:  But how can a lawyer who has

22   practiced for how many years -- short time,

23   Mr. Webster, but he's five or six years now -- and

24   you cite so many wrong cases?  How do you do that?

25   How do you go through that legal research and cite

```
 1   that like that?

 2          MR. NESBITT:  We were relying on -- when

 3   the brief came to us and had those in there -- and I

 4   will acknowledge right here, I did not do a good job

 5   of reading each and every case that was cited in it.

 6   That was my responsibility, and I failed on that

 7   responsibility.

 8          I think probably the other lawyers who

 9   were involved in this will say the same thing.  But

10   that does not AI make.  That means the case was

11   cited wrongly.

12          Now, the Court may be of the opinion that

13   it was cited wrongly because of AI.  I don't believe

14   it was.  It certainly wasn't by us.  But what I can

15   say is it was wrongly cited because it doesn't stand

16   for the proposition, which means I didn't do my job

17   as a senior lawyer -- the Texas senior lawyer on the

18   case.

19          THE COURT:  But it's not even close.  See,

20   that's a problem.  It's not even like I can see this

21   as a typical lawyer's mistake, you know, even an

22   egregious mistake.  It's just such a pattern

23   throughout the brief.  I just can't figure out what

24   else it would be.  I mean, you have to spend more

25   time, as I said, filing a brief like this than
```

1  filing a good brief.

2          MR. NESBITT:  And I don't disagree with

3  that.

4          THE COURT:  So what happened?  How many

5  years have you been practicing?

6          MR. NESBITT:  Thirty-four years.

7          THE COURT:  How could you do that?  How

8  could you possibly do that?

9          MR. NESBITT:  Not read the case.

10          THE COURT:  Yeah.

11          MR. NESBITT:  Pressed for time.  I was new

12  to the case.  I relied on others.  It was all bad

13  lawyering.

14          THE COURT:  But you said you worked on the

15  brief.

16          MR. NESBITT:  I did.

17          THE COURT:  So how did you work on the

18  brief?

19          MR. NESBITT:  I was focused on -- I had

20  interviewed witnesses, and I was focused on the

21  factual side of the brief and not focused so much on

22  the law side of the brief.  It's no excuse, but you

23  asked me why.

24          THE COURT:  What about Mr. Webster?

25          MR. NESBITT:  I believe he did mostly the

1   same thing that I did and ensuring compliance with

2   local practice.  Mr. Webster can certainly address

3   that.

4          But our -- but at the time -- how it came

5   about was, the brief was provided to us, we started

6   revising and exchanging.  We asked for additional

7   research.  We worked with counsel for New York on

8   areas we needed to beef up the brief on the

9   research.  But at the end of the day, the bad cases

10   made it into it.

11          THE COURT:  Like *Bradshaw v. Unity Marine*,

12   how did that even make it into the brief?  It was

13   the one about class actions.

14          MR. NESBITT:  Yes, ma'am.  I can't answer

15   that question.  I didn't put it in the brief, and I

16   didn't catch that.  It shouldn't have been there.

17          THE COURT:  The wrong legal reporter, the

18   wrong district court and the wrong year, not only

19   that.

20          MR. NESBITT:  I acknowledge all of those

21   things, as we did in our letter and as we did in our

22   response to the order to show cause.  It should not

23   have been in the brief.  It was miscited, and we

24   asked for permission to correct that brief.

25          And, quite frankly, had counsel -- now,

```
1   they say today they didn't move for sanctions, but,
2   in fact, they did move for sanctions in the reply,
3   and they didn't follow the rule.
4            If they called us and said, Hey, Earl, is
5   this AI?
6            I don't know.  It shouldn't be, I'll look
7   into it.  I would have got back to them.
8            Hey, Earl, these cites don't say what they
9   do.  We would have complied.
10           Now, is that their legal obligation?  No,
11  it's not their legal obligation in filing a reply.
12  It is their legal obligation under the *Horton* case
13  and Rule 11 --
14           THE COURT:  Rule 11, but there's
15  Section 1927 of Title 28.  There's the Court's
16  inherent authority.  There's all sorts of stuff that
17  this brief would attach to.
18           MR. NESBITT:  This Court has the authority
19  to penalize us, for sure.  Not our client, if it's
20  under 11(b)(2) or whatever, but certainly the
21  lawyers.  And we understand and accept that.  But I
22  would simply say, if you are going to punish us,
23  punish us for the right reasons, which is sloppy
24  lawyering, bad lawyering, but not AI.
25           THE COURT:  Well --
```

```
 1              MR. NESBITT:  I would like for -- if the
 2   Court would indulge, I would like for Mr. Zareh to
 3   have the opportunity to address the Court.
 4              THE COURT:  Yes, go ahead, please,
 5   Mr. Zareh.
 6              MR. NESBITT:  And if you have any
 7   questions for any of the lawyers --
 8              THE COURT:  I want to talk to Mr. Pennetti
 9   in a minute.
10              Go ahead.
11              MR. ZAREH:  Good morning, Judge Boyle.
12              THE COURT:  Good morning.  Please, please,
13   be honest with me.  It's okay if you did AI this
14   time.  We'll put it aside as a mistake, but I can't
15   believe this brief is not AI.
16              MR. ZAREH:  And I appreciate that, Judge,
17   and I want to address that directly.
18              First of all, good morning, Judge.  Thank
19   you for letting me into your courtroom.
20              THE COURT:  Sure.
21              MR. ZAREH:  I wish it was under better
22   circumstances, number one.
23              Number two, I am not -- I'm in this
24   wonderful position where I can confess to Your Honor
25   and come clean.  My name is on the firm.  I had a
```

```
 1  junior associate who was going through some personal
 2  crises that he didn't talk to us about.
 3              THE COURT:  Mr. Pennetti?
 4              MR. ZAREH:  No, ma'am.  Mr. Pham is here.
 5  He's got the flu, which is why he has the mask on.
 6              THE COURT:  I know, but I'm going to have
 7  him talk.
 8              MR. ZAREH:  And Your Honor, please do.
 9  But the fact of the matter is --
10              THE COURT:  Who was the junior associate
11  that wasn't him that worked on the brief?
12              MR. ZAREH:  Mr. Pham worked on the brief
13  with me.
14              THE COURT:  Was it --
15              MR. ZAREH:  Mr. Fant, Mr. John Fant.
16              THE COURT:  And Mr. Fant is here.
17              MR. NESBITT:  Mr. Fant is here.  He didn't
18  work on the brief, but he talked to several
19  witnesses.
20              THE COURT:  Who was the young associate
21  that you said --
22              MR. ZAREH:  It was Mr. Pham, William Pham.
23              THE COURT:  So he primarily worked on the
24  brief?
25              MR. ZAREH:  William and I worked on this
```

1  brief together.  The first brief that William wrote,

2  which I reviewed extensively, was an opposition to a

3  motion for summary judgment.

4          THE COURT:  What about Mr. Pennetti?

5          MR. ZAREH:  Mr. Pennetti is not at my

6  firm.  I don't think Mr. Pennetti worked on the

7  brief at all.

8          MR. NESBITT:  Your Honor, Mr. Pennetti was

9  formerly on the pleadings when he was at the Rogge

10 Dunn Group.  He left in May when the -- the day the

11 motion to dismiss was filed.  He did not have any

12 involvement or -- any involvement whatsoever in the

13 response.

14         THE COURT:  Okay.  That's fine.  That's

15 all I need to hear.

16         MR. NESBITT:  I'm sorry.

17         THE COURT:  And Mr. Pennetti, come up real

18 quick.

19         Mr. Pennetti, did you do anything to the

20 brief at all?

21         MR. PENNETTI:  No, Judge.

22         THE COURT:  Okay.  Thank you.  Go ahead

23 and sit down.

24         Okay.  So Mr. Pham.

25         MR. ZAREH:  We will refer to him as

1  William.

2         THE COURT:  Okay.  No, let's refer to him

3  by his last name.

4         MR. ZAREH:  Mr. Pham.

5         THE COURT:  How do you spell it?

6         MR. ZAREH:  Pham, P-H-A-M.

7         THE COURT:  Okay.  Okay.

8         MR. ZAREH:  Mr. Pham and I worked on the

9  brief together.

10         THE COURT:  Who worked on it the most?

11  Always somebody works on it the most.

12         MR. ZAREH:  Mr. Pham worked on it the

13  most.  I am the senior lawyer.  I reviewed it.  I

14  gave him my first set of comments, which was to

15  rewrite the brief, which he did.  He rewrote the

16  brief.  I looked at it a second time.  We had some

17  comments on some of the propositions.  I read a few

18  of the cases that I thought were controversial

19  propositions, and I thought they were fine.  And we

20  sent our part of the brief to Texas.

21         What I remember, Texas had their part of

22  the brief, and they were merged.  And at some point,

23  Texas deferred to New York and said, We're not going

24  to read the cases, we assume the New York guys got

25  the cases right.

```
 1              THE COURT:  So Texas told you they didn't
 2    read the cases?
 3              MR. ZAREH:  After the fact, after we got
 4    the --
 5              THE COURT:  Show cause order.
 6              MR. ZAREH:  No, no, Your Honor.  When we
 7    got their reply that accused us of using artificial
 8    intelligence, my first response was to call William
 9    and say -- Mr. Pham -- Did you use AI?
10              His response was, Hell, no.  It may be
11    wrong, but we certainly did not use AI.
12              And if you want -- and forgive me, Judge,
13    I'm also new to this.  But my teenage daughter tells
14    me that her teacher can run things through an AI
15    tester to see how much of something is AI.  So if
16    this was really an issue, if they really thought
17    that we were using artificial intelligence, they
18    could have called us and asked us that.  They could
19    have shown Your Honor some kind of test to show
20    that.
21              And, Judge, you don't know me.  I've never
22    been before Your Honor.
23              THE COURT:  I know.  I'm sure you're a
24    straightlaced guy.
25              MR. ZAREH:  When Your Honor starts off the
```

```
 1   hearing with, "I find it hard to believe that this

 2   was AI --"

 3            THE COURT:  Yeah.

 4            MR. ZAREH:  -- let me assure Your Honor,

 5   we don't need artificial intelligence to be this

 6   bad.  This was human misintelligence to be

 7   completely wrong, and it will not happen again.

 8            THE COURT:  I know it won't happen again.

 9   But like I said to him, Mr. Nesbitt, you have to

10   work really hard to get a brief this bad.  And I

11   don't think you can do it just by messing up and

12   making mistakes, negligence.  I think it has to be

13   some --

14            MR. ZAREH:  But --

15            THE COURT:  Nope -- some organized way of

16   misrepresenting everything.

17            MR. ZAREH:  Your Honor, if this was an

18   organized misrepresentation, we would not have been

19   so surprised when we got their reply.

20            THE COURT:  Well, maybe Mister --

21            MR. ZAREH:  If I can -- forgive me.

22            If I can just address the perfect storm,

23   that was this brief.  And I'm not offering this as

24   an excuse at all.  Mr. Pham had some remarkable

25   personal crises he was going through.  That led him
```

```
1   to do some errors on our brief.
2           The attorney at the Rogge Dunn Group who
3   was previously on the case had gone off the case.
4   So Mr. Nesbitt had been on the --
5           THE COURT:  That's Mr. Pennetti.
6           MR. PINNETTI:  Yes, Your Honor.
7           MR. ZAREH:  I think Mr. Nesbitt had been
8   on for half an hour on the case, although it's been
9   a pleasure working with him.
10          Look, these cases, the vast majority of
11  them came from our firm, it came from my watch.  And
12  whatever William was going through at the time, it
13  rests with me.
14          I did not use artificial intelligence.
15  Nobody at my firm uses artificial intelligence.
16  And, quite frankly, when an attorney has a personal
17  crises and they just do a bad job as an attorney,
18  one of the things I would ask Your Honor to do is to
19  allow us to attend to the crisis and refile.
20          THE COURT:  Yeah, yeah, I may do that, but
21  is there anything else that you have?
22          MR. ZAREH:  Yes, Your Honor.  There's two
23  other things.
24          To the extent that there are specific
25  cases that made it that shouldn't have made it --
```

```
 1            THE COURT:  Like Johnson v. Pride has
 2   nothing to do with the class action, found its way
 3   into your response for the proposition that it
 4   upheld a class action claim.
 5            MR. ZAREH:  Your Honor, so I asked that
 6   question specifically.  How did this happen?  Your
 7   Honor, I've got one better for you.  When you have
 8   things in quotation marks, those should be in the
 9   citation, right?  Our original brief didn't do that.
10            THE COURT:  I know.  I mean, I know that.
11   I've seen all of the mistakes.
12            MR. ZAREH:  Your Honor, forgive me, if I
13   can just share with the Court.  I appreciate the
14   fact that Your Honor wants us here to explain why
15   this happened, how it happened, and I am trying to
16   tell you as best I can.
17            Every time we needed a citation for
18   something, I asked William to look it up, and he
19   made an error and I didn't proof it.  It's on my
20   watch, and I take full responsibility.
21            THE COURT:  I appreciate that very much.
22   But Mr. Pham has to -- is it Mr. Pham?
23            MR. ZAREH:  Yes, Your Honor.
24            THE COURT:  -- Mr. Pham has to speak for
25   himself.
```

1          MR. ZAREH:  Of course he does, and of

2    course he will.  I'm happy to do that, Your Honor.

3          The one thing I would ask -- and we do

4    this all the time when an attorney is going through

5    a personal crises -- is please put it in context.

6          THE COURT:  What do you mean?  Oh, put it

7    in context with his crisis, yes.

8          MR. ZAREH:  Okay.

9          THE COURT:  Thank you.

10          MR. ZAREH:  Unless Your Honor has anything

11    more -- and really, Your Honor, I am here to look

12    this Court in the eyes and explain anything and

13    everything to Your Honor.

14          THE COURT:  I know you are.

15          MR. ZAREH:  Okay.  Thank you, Your Honor.

16          THE COURT:  All right, Mr. Pham, come on

17    up here.

18          MR. ZAREH:  And Your Honor, Mr. Pham is

19    dealing with an illness.

20          THE COURT:  Mr. Pham, will you take your

21    mask off, please?

22          All right.  Now, I'm going to tell you, no

23    matter how badly you're feeling, and you're looking

24    like you feel pretty bad, and I don't know if that's

25    because of this or your sickness.

```
 1            Mr. Pham, I just want you to fess up if
 2    this was AI -- and I think it was -- come on, stop
 3    that.  Come on, stop that.
 4            Now, I think this was an AI brief
 5    partially.  And you can tell me it wasn't, but I'm
 6    not going to believe you.  But go ahead, tell me
 7    what it was.
 8            MR. PHAM:  No, Your Honor.  Like Mr. Zareh
 9    had mentioned, I was going through a lot of
10    personal --
11            THE COURT:  Speak up.
12            MR. PHAM:  I was going through a lot of
13    personal issues at the time.  And the way that I
14    organized the brief, it was left subject to a lot of
15    error if I were to make edits to it, which is what
16    happened.
17            THE COURT:  You know, edits to it.  It's
18    not even -- but it's cases that don't even stand for
19    the proposition that you've cited them for.  Where
20    did you pull up *Johnson v. Pride Industries*?
21            MR. PHAM:  So, Your Honor, how --
22    unfortunately, how I organized the brief writing, I
23    pulled many more cases that -- many more cases that
24    ultimately --
25            THE COURT:  Speak up.  Speak up.  You
```

```
1   know, I'm sure you're sick, but you don't -- it
2   seems like you're more sick because of this
3   situation.  So speak up, please.
4            MR. PHAM:  So the cases that I pulled for
5   the response, there were a lot more cases.
6            THE COURT:  The cases you pulled were
7   what?
8            MR. PHAM:  There were a lot more cases I
9   found that ultimately were whittled down.  I think
10  there were 40, in the neighborhood of 40 cases that
11  were in the response.  I had originally pulled close
12  to about 80 to 90, I believe.
13           And the way that I organized what I needed
14  to put into the brief and what I wanted certain
15  cases to say, by putting in -- by making edits to
16  that grid, it shifted down a lot and led to a lot of
17  mis-organization, and I apologize for it.
18           THE COURT:  I mean, did you even proofread
19  it?
20           MR. PHAM:  I did.  And unfortunately, you
21  know, my personal issues kind of got in the way --
22           THE COURT:  Yeah, I mean --
23           MR. PHAM:  -- of being more accurate.
24           THE COURT:  I just can't believe this
25  isn't an AI brief, I can't.
```

```
 1              Anything else?

 2              MR. PHAM:  No, Your Honor.

 3              THE COURT:  All right.  Sit down.

 4              What do you want me to ask him?  Do you

 5    want me to ask him something else?  Because he says

 6    it's not an AI brief, and that's all I need to hear

 7    from him.

 8              MR. ZAREH:  Your Honor --

 9              THE COURT:  Come on up.  Come on up.

10              MR. ZAREH:  -- I think what Mr. Pham was

11    trying to tell the Court is he organized 80 or 90

12    cases in a grid on a spreadsheet.  When he realized

13    some of the cases weren't appropriate, he deleted

14    some of those and it got misaligned.

15              Judge, I appreciate the fact that Your

16    Honor thinks this is an AI brief, and there's

17    nothing we can say.

18              THE COURT:  There's something you can say,

19    but you haven't said it yet.

20              MR. ZAREH:  Judge, what else can I tell

21    you?

22              THE COURT:  I mean. . .

23              MR. ZAREH:  I didn't use it.  My associate

24    didn't use it.  Our firm didn't use it.  The Rogge

25    Dunn Group has told you they didn't use it.  We have
```

```
 1   sworn to it before, Your Honor.  If Your Honor wants
 2   to take on some kind of technology to review the
 3   brief to see what score it gets --
 4            THE COURT:  Wait a minute.  I did, on
 5   ChatGPT, an AI search engine, and I found this
 6   Johnson v. Pride Industries cited in the same
 7   erroneous manner in which your response cited it.
 8            MR. ZAREH:  That's hardly a scientific
 9   analysis of the brief --
10            THE COURT:  No, no --
11            MR. ZAREH:  -- respectfully.  And if I
12   may, if my 13-year-old can be cited by her English
13   teacher for using AI and go do it over again,
14   because I ran it through some kind of a search
15   filter to see if you used AI, then, respectfully, we
16   can do that here.
17            THE COURT:  I said, my clerk found it in
18   ChatGPT, an AI search engine that describes Johnson
19   v. Pride Industries in the same erroneous manner
20   that the response does.
21            MR. ZAREH:  Your Honor, respectfully.
22            THE COURT:  No, no.  Are you listening to
23   me?
24            MR. ZAREH:  I am.
25            THE COURT:  Okay.
```

```
 1              MR. ZAREH:  May I respond?
 2              THE COURT:  Yes.
 3              MR. ZAREH:  I teach CLEs for Ethics --
 4              THE COURT:  I don't want to hear about
 5    that.
 6              MR. ZAREH:  -- and one of the things that
 7    we constantly tell lawyers is that the trouble with
 8    AI is it takes some amount of truth and puts some
 9    amount of fabrication.  And just because Your Honor
10    found a similar citation, one, or your clerk, using
11    ChatGPT for this specific case hardly proves that we
12    did artificial intelligence.
13              THE COURT:  I just think that your arm's
14    length dealing with Mr. Pham -- and I think it was,
15    because it wasn't right on him or you would have
16    caught these things -- is it's just you're trying to
17    go down with the ship, as a captain would, and I
18    understand that.  But I just want to hear that
19    somebody around here thinks this is an AI brief
20    besides the defense.
21              MR. ZAREH:  I do not.  I have sworn
22    against that.
23              THE COURT:  Okay.
24              MR. ZAREH:  I will go down with the ship.
25    Bring me a stack of Bibles, I will swear to it.  We
```

```
 1   did not use artificial intelligence.

 2             THE COURT:  Okay.

 3             MR. ZAREH:  And, Your Honor, if you think

 4   we did, there's a very easy way to prove it.  We can

 5   run the brief through an algorithm and report back

 6   to Your Honor how much of it is.

 7             THE COURT:  No, that's all right.

 8             Anything else from the defense -- from the

 9   plaintiffs?

10             How about the defense, Ms. DeSantos,

11   anything else?

12             MS. DE SANTOS:  I think really, just to

13   put a bit of a fine point on that pencil, Your

14   Honor, Mr. Zareh said that he worked with Mr. Pham

15   on preparing this response to the motion to dismiss;

16   that he read the cases, reviewed/edited the brief,

17   gave comments on the draft.

18             I lost -- I -- just quickly, one, two,

19   three, four, five, six, at least six cases, there's

20   more --

21             THE COURT:  There are at least ten.

22             MS. DE SANTOS:  At least.  But some of the

23   ones that are much more egregious in misrepresenting

24   to the Court what the legal holdings of those cases

25   are, are significant.
```

```
 1              I could not agree more with the Court --
 2     and we argue this in our response to their OSC
 3     response -- this kind of mistake doesn't happen
 4     repeatedly over and over.
 5              And one additional note -- and I think
 6     it's really clear and really important -- the errors
 7     that were made, the really substantive errors that
 8     were made in the representation to the Court of what
 9     those cases held coincidentally go directly to rebut
10     a specific legal issue that we raised in our motion
11     to dismiss.
12              THE COURT:  Um-hum.  Um-hum.
13              MS. DE SANTOS:  Standing.  Oh, there's two
14     cases that specifically --
15              THE COURT:  That don't stand for standing.
16              MS. DE SANTOS:  -- that don't stand for
17     that standing proposition in a class certification
18     case.
19              The hostile work environment argument.
20     The totality of the circumstances absent some other
21     specific evidence to rise to this severe pervasive
22     level can support a hostile work environment claim.
23     Two cases that they cite for that, *Brown* and *Keeling*
24     don't say that.  In fact, they have the exact
25     reverse holding.
```

```
 1              Those two issues make it very hard for me
 2   to question that this is not an AI brief; that the
 3   error occurred over and over and over again, and
 4   that it coincidentally also addresses a specific
 5   substantive legal issue --
 6              THE COURT:  Yeah, the issue.
 7              MS. DE SANTOS:  -- that rebuts or purports
 8   to rebut one of the issues that we raised.
 9              So that's really the only other item I
10   wanted to point out to the Court.
11              THE COURT:  Okay.  Thank you.
12              You know, this is the beginning of this,
13   this AI stuff, and I think it's very interesting.  I
14   can't believe people are using it.  But Mr. Zarah, I
15   don't think you probably used it, I don't think you
16   did, but I think Mr. Pham did.  He's over there
17   acting all sick, and I don't think he's really that
18   sick.
19              But, you know, you need to address -- can
20   you look at me, please, sir?  You.  Mr. Zareh.
21   Mr. Zareh, you need to look at me.
22              I think you need to address his problems
23   in-house and deal with that, whatever it was, but I
24   think we have an AI brief here.  And I don't think
25   that you knew about it.  I agree that you didn't
```

```
1    probably know about it.  And I can't believe the
2    Dallas lawyers did not look at this brief any more
3    closely than they did.  But I think it's an AI
4    brief, and I think Mr. Pham knows, and that's why
5    he's sick today.
6              So I think what I'm going to do is this.
7    I am going to grant the motion to dismiss, not on
8    the AI brief, not on the AI stuff, but on the
9    allegations and the response the way it was.  They
10   don't -- you know, it's impossible to -- I mean, I'm
11   going to grant the motion to dismiss, but I'm going
12   to give you another chance to re-brief it.  Okay?
13             So you can file -- we're going to grant
14   the motion to dismiss on the pleadings, themselves,
15   not on the AI portion of it.  But I do think the AI
16   portion is appropriately addressed, and I am going
17   to do a public reprimand, because I find it's bad
18   faith.
19             And I'm sorry, Mr. Zareh, because I don't
20   know how much you were involved with this, Mr. Pham
21   knows and it was bad faith to file this brief and
22   then to come back and defend it.  And I think for
23   that, I'm going to do a public reprimand.  That's
24   all I'm going to do, and then I will move on with
25   this case.
```

```
 1              I probably wouldn't have done a public
 2    reprimand if you-all -- well, I wouldn't have done
 3    one if you-all had just agreed that this is an AI
 4    brief, but maybe you don't know.  Maybe you don't
 5    know.  Maybe you do know, I don't know.
 6              So that's what I'm going to do.  And we
 7    will get a scheduling order out -- a scheduling for
 8    the briefing out soon.
 9              Is there anything else, Mr. Zareh,
10    Mr. Nesbitt?
11              MR. NESBITT:  Just one point of
12    clarification on your ruling, Your Honor.
13              Did I understand that the Court is going
14    to grant the motion to dismiss but give us a chance
15    to replead the complaint?  Or do you want to us
16    respond --
17              THE COURT:  No, no, I want you to respond
18    to the motion to dismiss, yeah.
19              MR. NESBITT:  Okay.
20              THE COURT:  Yes, the motion to dismiss,
21    yes.
22              MR. NESBITT:  Appropriately.
23              THE COURT:  All right.  We will see what
24    happens, and I trust this won't happen again.
25              MR. ZAREH:  No, Your Honor.
```

```
 1              THE COURT:  I know.

 2              All right.  Anything else?

 3              MS. DE SANTOS:  So just to make sure I

 4    understood that, the motion to dismiss is granted.

 5              THE COURT:  Yes.  It's granted without

 6    prejudice for them to, you know, file it -- file

 7    another one -- I mean, yeah, start again.  So you

 8    would file the motion to dismiss.  Right?  No, you

 9    would file a response to motion to dismiss.

10              MR. ZAREH:  We're filing another response

11    to --

12              THE COURT:  I gotcha.  I gotcha.

13              MR. NESBITT:  And the Court is going to

14    tell us when that's due?

15              THE COURT:  Yes, I will, in the next

16    couple of days, I'll draft it in an order.

17              MR. NESBITT:  Just one personal request,

18    Mr. Webster and myself are leaving the country

19    tonight, and we're not back for ten days.

20              THE COURT:  That's okay.  I will give you

21    30 days, 40 days, something like that -- plenty of

22    time.

23              MR. NESBITT:  Thank you.  I appreciate it.

24              MS. DE SANTOS:  Is the response that

25    they're going to file going to be essentially a
```

1  request for a rehearing or --

2          THE COURT:  No, it's going to be a

3  response to your motion to dismiss.  That's all it

4  is, and you can file a reply.

5          MS. DE SANTOS:  On a motion that's already

6  been granted.

7          THE COURT:  Okay.  That's right.  Yeah.

8  So we've got the motion to dismiss resolved, and now

9  we need another motion to dismiss.  So how are we

10  going to do this?

11          MS. DE SANTOS:  The motion to dismiss

12  addressed the class issues, which we argue cannot be

13  sustained.

14          THE COURT:  I'm going to let them do that

15  again.

16          MS. DE SANTOS:  So why don't -- if the

17  Court is going to grant the motion to dismiss,

18  perhaps, then, what the plaintiffs ought to do is

19  file a motion to reconsider and argue the basis of

20  that and whatever legal -- legitimate legal

21  citations support a motion to reconsider the Court's

22  order on the motion to dismiss.

23          THE COURT:  Or you could just amend the

24  complaint and somehow -- I think we start over

25  again.  You amend the complaint and take anything

```
 1    out of the there that doesn't belong there, but I
 2    don't know that there is anything.  And then you
 3    file a motion to dismiss, second motions to dismiss.
 4              All right?
 5              MR. NESBITT:  That's what Mr. Webster had
 6    suggested, and we will offer to do that.
 7              MS. DE SANTOS:  On a third amended.
 8              THE COURT:  Yes.  Well, I don't know what
 9    it is right now, second amended, third amended,
10    whatever it is.  That's the way we will do it.  All
11    right?
12              And I appreciate so much that you-all did
13    all this work on that.  I think you're absolutely
14    bulls eye right about this AI brief.  And I hope --
15    I don't think we will see it again.  We will see if
16    we do.  All right?  But in the meantime, you haven't
17    asked for sanctions.  I gave you a sanction anyway.
18    That's all.  Okay?
19              Anything else?
20              MR. NESBITT:  Our apologies to the Court
21    and Counsel.
22              THE COURT:  We will be in recess.
23              (Court in recess at 11:12 a.m.)
24
25
```

```
 1              C E R T I F I C A T E
 2         I, Shawnie Archuleta, CCR/CRR, certify
 3    that the foregoing is a transcript from the record
 4    of the proceedings in the foregoing entitled matter.
 5         I further certify that the transcript fees
 6    format comply with those prescribed by the Court and
 7    the Judicial Conference of the United States.
 8         This 20th day of November 2024.
 9
10
11                    s/Shawnie Archuleta
                      Shawnie Archuleta CCR No. 7533
12                    Official Court Reporter
                      The Northern District of Texas
13                    Dallas Division
14
15
16    My CSR license expires:  December 31, 2024
17    Business address:  1100 Commerce Street
                         Dallas, TX  75242
18    Telephone Number:  214.753.2747
19
20
21
22
23
24
25
```